IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ALBERTO SERRANO, as Administrator of the Estate of JUAN-MANUEL MEDINA-SEVILLA, deceased, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>CITY OF IRONDALE, et al.,<br><br>    Defendants. | CIVIL ACTION NO.<br>06-AR-0122-S |

## **MEMORANDUM OPINION**

This is a case in which two plaintiffs invoke the court's jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983. Both plaintiffs allege that they are the victims of constitutional torts committed by a municipality and one of its police officers. State law tort claims are appended. The court now has for consideration the motion of the police officer defendant, P.S. Kelley ("Kelley"), for summary judgment. Although the other defendant, City of Irondale ("the City"), has also filed a motion for summary judgment, the court will address its motion in a separate opinion, because the issues raised by the City are materially different from those raised by Kelley, particularly Kelley's defense of qualified immunity, a defense not available to the City and one upon which Kelley has already indicated he will take an interlocutory appeal in the event of an adverse ruling.

1

The only surprise is that he did not appeal from the court's earlier denial of his motion to dismiss under Rule 12(b)(6).  *See Danley v. Allyn*, 480 F.3d 1090 (11th Cir. 2007).

Kelley and the City have also filed a motion to strike and/or to preclude any use by plaintiffs of the expert report of Dr. Phillip Hayden, an authority on what is and is not proper police procedure.  Dr. Hayden is proffered by plaintiffs, Alberto Serrano ("Serrano"), as administrator of the estate of JUAN-MANUEL MEDINA-SEVILLA, deceased ("Sevilla"), and Elizabeth Para de Medina ("Para de Medina"), in defense of Kelley's Rule 56 motion.  Because Dr. Hayden's opinion is not necessary to this court's analysis of Kelley's motion, the court will defer its ruling on the motion to strike and/or preclude.

Pursuant to Rule 56, Kelley seeks the dismissal of all claims by Serrano and by Para de Medina.  Kelley necessarily contends that the undisputed facts require judgment in his favor as a matter of law.  Before evaluating plaintiffs' various claims, the court will set forth the pertinent evidence construed in favor of the plaintiffs.  This is the core requirement of Rule 56.  The court will not here discuss the evidence that is pertinent only to the claims brought against the City.

## The Relevant Evidence

On the evening of October 14, 2005, the City's police department received a call that gunshots had been heard at the

Eastwood Mobile Home Village.  Kelley, a City police officer, was one of the officers who responded.  A fellow officer, Mangina, was the first officer to reach the scene.  He tried to communicate with three Hispanic men, who flagged him down.  Although they were not fluent in English, one attempted to communicate with Mangina using broken English and hand signals, indicating that he had argued with Sevilla, the decedent, whose subsequent death at the hands of Kelley is the subject of this action.  The as yet unnamed Hispanic man who spoke to Mangina claimed that Sevilla had fired a gun at him.  He pointed out Sevilla, who was sitting on the porch of the mobile home in which Sevilla lived with Para de Medina, who owned the home.  Proceeding solely on this information, Mangina informed Kelley that Sevilla was the person who had discharged a weapon and who had precipitated the call for police assistance.  Upon hearing this, Kelley went to his patrol car and retrieved a high-powered sniper rifle.  In Kelley's deposition, he does not say whether he owned the rifle or the City owned it.  Several officers proceeded to observe Sevilla, who was still sitting on the front porch.  The rifle had a blurry scope, so Kelley acquired another one with a clearer scope.  Obviously, this took some time.  Kelley had two scoped rifles because he was trained as a sniper.  He then proceeded to observe Sevilla, both with his naked eye and through the scope.  The two central characters, Kelley and Serrano, were obviously a considerable distance from each other.  Kelley

estimates it at forty-two yards.  Otherwise, Kelley would have had no need for a scope.  The use of a scoped rifle necessarily implies distance between the rifle holder and the target.  After the officers set up a perimeter, Kelley contends (1) that Sevilla was throwing things off the porch and was kicking the walls; (2) that another officer, Kellogg, gave Sevilla commands in limited Spanish, but that Sevilla ignored them; (3) that Sevilla ran into the mobile home and suddenly reappeared; (4) that Sevilla raised his arms in a manner consistent with the leveling of a firearm; and (5) that Mangina shouted "gun".  Kelley says that only after he saw and heard these things did he shoot and kill Sevilla, believing that Sevilla presented a clear and present danger.

As previously stated, the court takes as true plaintiffs' version of all of the evidence, including all favorable inferences from it.  Serrano's evidence conflicts in material respects with Kelley's evidence.  It comes from several sources, including the deposition testimony of Kelley's fellow police officers and from two ostensibly disinterested eye-witnesses, Jennifer Gossett and Carmen Hernandez Garcia, who observed the incident from a mobile home located across the street.  Serrano's evidence reflects (1) that Sevilla spoke from his front porch to Mangina and to the three Hispanic men who had pointed him out, but the exact nature of the conversation, largely in Spanish, is unclear; (2) that Sevilla entered the mobile home; (3) that Sevilla reemerged; (4) that when

4

he stepped out onto the porch he was immediately shot in the head and killed; (5) that Sevilla never presented a weapon or had a weapon, did not raise his hands in a firing position, and did not make any sudden or otherwise threatening movements; (6) that neither of the two neighbor-witnesses heard the word "gun", much less saw a gun.  These two witnesses were apparently located closer to Sevilla than Kelley was.  A predominating and undisputed fact is that no officer could have actually seen a gun in Sevilla's hand, because no gun was ever found on the premises.  Only one shot was fired, namely, the shot fired by Kelley, using the rifle and scope.  Why other officers who were located closer to Sevilla than Kelley was did not fire their weapons is unexplained.  Inferentially, the other officers knew better than to react to the situation as Kelley reacted to it.  More often than not, there is a hail of gunfire when a suspect levels a firearm at a group of armed police officers.  The uncontradicted testimony of eyewitnesses is that the three men, one of whom later complained to Mangina, had, prior to the arrival of the police, argued with Sevilla, pulled him into his yard, hit him, and fired a shot at him.  This is direct evidence from disinterested witnesses, and not hearsay.  In other words, the gunshot that precipitated the police presence was not fired by Sevilla, who had been a victim and not an aggressor.  Any jury could conclude from this evidence that the complaint of violent conduct by Sevilla was the fabrication of one of his harassers, who

now seem to have disappeared, and whose version of events is conspicuously absent.  After Kelley fired the fatal shot, several officers approached the mobile home and entered it for the purpose of searching it.  Kelley was not among them.

On this evidence, it would be a simple matter, and would be more than understandable, for a jury to find, without having to determine that Kelley was or was not guilty of ethic animus toward Hispanics, that Kelley had no reasonable basis for shooting Sevilla in the head.  Such a conclusion could reasonably be reached using common sense, without any reliance whatsoever upon any expert opinion about what is or is not appropriate police procedure under similar circumstances.  The mere use of a scoped rifle implies deliberation, particularly when it is generally understood that a scoped rifle requires steady aim focused on a small target, such as a head.  When a scope is aimed at a man's head, it manifests an intent to kill that man when the shooter pulls the trigger.  The view of a head through a scope is not wide enough to include the lower body of the targeted individual.  Arguably, Kelley could not see Sevilla's hands through the scope, and therefore could not have observed his hand movements.  If Kelley heard the word "gun", and if that word was uttered by another officer, the word could have been contained within a sentence such as, "He **may** have a gun", or, it could have been within a sentence such as, "I **see** a gun".  In any event, Kelley did not himself actually see a gun, because there

was no gun.  Either Kelley did not carefully observe before he fired, or paid little attention to what he saw.  Kelley heard no gunfire before he fired, because none of his fellow officers fired their guns.

The use of a sniper rifle is simply not an appropriate first employment of force by a police officer under the set of facts that a jury could easily find in this case.

### Serrano's § 1983 Fourth Amendment Excessive Force Claim

In Count V of the second amended complaint, Serrano claims that Kelley deprived Sevilla of his Fourth and Fourteenth Amendment rights to be free from excessive force, a right protected by 42 U.S.C. § 1983 in the event the force complained of was applied by a state actor.  Kelley concedes that he was acting under color of state law.  The court will consider Serrano's excessive force claim only in terms of the Fourth Amendment, which is embraced by the Fourteenth Amendment.  In his Rule 56 motion, Kelley claims that he is entitled to qualified immunity.  The court is called upon first to determine whether or not the evidence, construed in favor of Serrano, pictures a violation of the Fourth Amendment, and if so, whether the violation is of the kind as to which a police officer is forewarned that it is unconstitutional.

It is obvious that Kelley's fatal shot constituted a "seizure" as that word is used in the Fourth Amendment.  In *Tennessee v. Garner*, 471 U.S. 1, 7 (1985), the Supreme Court held that

"apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment". This leaves for discussion the question of whether this particular "seizure" was reasonable or unreasonable. If unreasonable, it constituted a violation of the Fourth Amendment.

The Supreme Court has held that "[w]hen confronted with a claim of qualified immunity, a court must ask first the following question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?... claims of excessive force are to be judged under the Fourth Amendment's 'objective reasonableness' standard." *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (internal punctuation and citations omitted). Although the events surrounding Sevilla's death are disputed in material respects, the court, viewing the evidence in Serrano's favor, must decide whether the highly accurate and deadly head shot was "objectively reasonable".

The Supreme Court has articulated the following test for "objective reasonableness" in the context of a seizure by the use of deadly force:

> ***A police officer may not seize an unarmed, nondangerous suspect by shooting him dead***... Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm... it is not constitutionally unreasonable... [to use] deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of

serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Garner*, 471 U.S. at 11-12 (emphasis added).

More recently the Supreme Court has emphasized the "reasonableness" evaluation inherent in *Garner*, and downplayed the use of *Garner* as a multifactor test. *See Scott v. Harris*, 127 S.Ct. 1769, 1777-78 (2007). Again, judging the instant evidence in the light most favorable to Serrano, Kelley's actions were objectively unreasonable. Serrano's evidence demonstrates that Sevilla was an unarmed, nondangerous suspect. Additionally, nothing in Serrano's version of the facts would have given Kelley probable cause to believe that Sevilla posed an imminent threat of serious physical harm to anyone. The possibility of miscommunication because of the language barrier cuts both ways, but in the context of a Rule 56 consideration, it cuts against Kelley, who, as a result of that barrier, was arguably obligated to use extra caution in evaluating the situation. Kelley did not see Sevilla holding a weapon, was not told, unless by hearing the word "gun", that Sevilla had a weapon, was not threatened by Sevilla, and did not see anything to indicate that Sevilla intended to escape from the perimeter that Kelley and other officers had established. Lastly, no warning was given to Sevilla before the fatal shot was fired. Even if the word "gun" was uttered before Kelley squeezed the trigger, a fact disputed by eyewitnesses easily

within earshot, Kelley could fairly be found to have been entirely "too-quick-on-the-trigger", and to have crossed the line between simply making a horrible mistake of judgment and committing a constitutional tort.

The court is well-aware that Kelley's evidence is in direct conflict with Serrano's evidence. This only means that there exists a jury question as to the constitutionality of Kelley's actions. A jury, in making credibility determinations, will be called upon to decide who it believes, and on that basis will decide whether Kelley's fatal shot did or did not constitute the "excessive force" precluded by the Fourth Amendment.

Once the theoretical constitutional violation threshold has been passed, as it has been here, the only question remaining under Rule 56 is whether Kelley was on notice, by clearly established law, that what he was about to do would, if he did it, violate his target's constitutional rights:

> [T]he focus is on whether the officer had fair notice that [his or] her conduct was unlawful... [and] is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.

*Brosseau*, 543 U.S. at 198. *See also Vaughan v. Cox*, 343 F.3d 1323, 1329 (11th Cir. 2003). ("if we conclude that a reasonable jury could find that Vaughan's constitutional rights were violated under the facts alleged, we must determine whether Vaughan's rights were

clearly established - that is, whether it would have been clear to a reasonable officer that Deputy Cox's conduct was unlawful").

Although the Supreme Court has warned of the "hazy border between excessive and acceptable force," *Saucier v. Katz*, 533 U.S. 194, 206 (2001), it is clear from the instant evidence, again construed in favor of Serrano, that a police officer, such as Kelley, was unmistakenly on notice that the use of deadly force against an unarmed, non-dangerous suspect, who was not threatening the officer, would not only be an act of bad judgment, but would be constitutionally impermissible. *See, e.g., Brosseau*, 543 U.S. at 197-98; *Garner*, 471 U.S. at 11; *Vaughan*, 343 F.3d at 1329-30; and *Robinson v. Arrugueta*, 415 F.3d 1252, 1255 (11th Cir. 2005). It should have been clear to Kelley, and to all other police officers, that the immediate use of deadly force in the form of a sniper's bullet to the head of an unarmed man, not previously warned of his exposure to deadly force, is unconstitutional.

After Kelley's Rule 56 motion was under submission, Kelley submitted supplemental authority, namely, *Berube v. Conley*, No. 06-2644, 2007 WL 3171641 (1st Cir. Oct. 31, 2007). Much more apt, and much more persuasive than *Berube*, is the uncited, unpublished opinion of the Eleventh Circuit of the same date, October 31, 2007, in which the Eleventh Circuit affirmed the well-reasoned unpublished opinion of the Northern District of Georgia in *Holmes v. Walker*, No. 05-2921 (N.D. Ga. May 5, 2007), wherein a police officer was denied

qualified immunity in a shooting incident not unlike this one in several material respects.

It is entirely possible that a jury, faced with this conflicting evidence, and having the responsibility for determining credibility (a responsibility thankfully not shared by this court), may reach a conclusion in favor of Serrano or one in favor of Kelley.  Clearly then, there is a genuine dispute of material fact.  This genuine dispute creates a jury question.  It prevents a finding under Rule 56 that Kelley is qualifiedly immune.

## **Serrano's § 1983 Due Process Claims**

Serrano claims in Counts III and V that Kelley is also liable under 42 U.S.C. § 1983 because he violated Sevilla's Fourteenth Amendment "due process" rights through the use of the same excessive force complained of in Count V.  As far as this court can tell, Serrano has not revisited his "due process" claims since the allegations were made.  Despite this court's indication in its December 5, 2006 order that it expected more particularity with respect to Serrano's general due process claim (Count III), Serrano still has not informed the court which, if any, of Kelley's actions constituted a denial of the decedent's generalized due process rights, whether procedural, substantive, or both.  Perhaps the reason for Serrano's retreat from his "due process" contentions is that he now realizes that he erroneously relied on the Due Process Clause as an alternative basis for his excessive force claim (Count

V). The Supreme Court has declared:

> *[A]ll* claims that law enforcement officers have used excessive force... in the course of a[]... "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

*Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original). If Serrano had seriously urged upon the court that Kelley's actions violated "due process" in the context of an excessive force claim, he would have been wasting his time. The fact that Serrano has offered nothing in response to Kelley's motion for summary judgment as addressed to Count III's generalized due process claim, or, for that matter, in support of the due process claim in Count V, suggests that Serrano has wisely abandoned these claims. *See Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (approving a district court's classification of a claim alleged in the complaint but not addressed on summary judgment as abandoned).

### Serrano's § 1983 Equal Protection Claim

Serrano has failed to respond to Kelley's motion for summary judgment regarding the potentially spurious "equal protection" claim contained in Count IV of the second amended complaint. If anything, this claim is more fanciful than the "due process"

claims.  Like his due process claims, Serrano has abandoned this claim by not arguing it.  *See Road Sprinkler*, 10 F.3d at 1568.  Furthermore, if this court could have been persuaded to recognize, or to attempt to "establish", a new, novel constitutional right to "equal protection" under circumstances like these, Kelley would not have been forewarned of it, and would be qualifiedly immune.

### **Serrano's Wrongful Death Claim**

In Count I, Serrano presents a simple, straight-forward Alabama state-law wrongful death claim.  In Kelley's motion for summary judgment, he argues that he is entitled to summary judgment on this claim because he has state-agent immunity for his discretionary actions as a police officer.  Alabama's peace officer immunity statute provides:

> Every peace officer... who is employed... by the state or a county or municipality thereof,... and whose duties... include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state... shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

Ala. Code § 6-5-338(a) (1975).  In *Moore v. Crocker*, 852 So.2d 89, 90 (Ala. 2002), the Alabama Supreme Court said that, "[t]his statute, by its terms, extends state-agent immunity to peace officers performing discretionary functions within the line and scope of their law-enforcement duties."  That court later attempted to define discretionary acts as those where "there is no

hard and fast rule as to the course of conduct that one must or must not take and those requiring exercise in judgment and choice and involving what is just and proper under the circumstances." *Hollis v. City of Brighton*, 950 So.2d 300, 307 (Ala. 2006) (quoting *Montgomery v. City of Montgomery*, 732 So.2d 305, 310 (Ala. Civ. App. 1999)) (internal punctuation omitted).

Unfortunately for Kelley, his own police chief testified, not unexpectedly, that the City's police officers do not have the discretion to shoot an unarmed man. Serrano emphasizes this testimony and urges the court to conclude as a matter of law that Kelley's actions were non-discretionary so that there is no peace officer immunity. Because neither party has definitively established the policies or procedures of the City regarding the use of deadly force by police officers, and because this court is bound to take the evidence in the light most favorable to Serrano, it cannot decide as a matter of law that Kelley is or is not entitled to peace officer immunity. His actions, at least arguably, were not "discretionary", and therefore not protected.

Assuming, *arguendo*, that Kelley's actions were discretionary, he would still not be entitled to immunity, based on the *Cranman* exceptions to state-agent immunity. Common law state-agent immunity was first articulated in a plurality opinion in *Ex Parte Cranman*, 792 So.2d 390, 405 (Ala. 2000). In a more recent decision, the Alabama Supreme Court restated and re-affirmed

*Cranman* state-agent immunity and its exceptions, as follows:

> A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's... (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons... Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent *shall not* be immune from civil liability in his or her personal capacity (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

*Ex parte City of Tuskegee*, 932 So.2d 895, 903 (Ala. 2005) (quoting *Cranman*, 792 So.2d at 405) (emphasis in original). In *Hollis*, the court expanded category four of *Cranman*, quoted above, and extended state-agent immunity to those already entitled to statutory peace officer immunity. *See Hollis*, 950 So.2d at 309. (extending immunity to agents "exercising judgment in the enforcement of criminal laws of the State... *or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-338(a), Ala. Code 1975*") (emphasis in original). The above-quoted exceptions to state-agent immunity apply to peace officers, such as Kelley. The state-agent immunity enjoyed by peace officers is not dissimilar to the qualified immunity they can enjoy under § 1983. In fact, the two immunities are so nearly identical as to be difficult to separate in particular cases.

16

Kelley arguably acted "beyond his authority," a finding that would be justified simply on McIntosh's testimony.  As discussed previously, for the purposes of Rule 56 analysis, Kelley also acted in disregard of the Fourth Amendment's requirements. Therefore, even if Kelley, broadly speaking, was engaging in a discretionary act in deciding whether to shoot Sevilla, he is nonetheless not entitled to immunity under Alabama law, as a matter of law, whether via the explicit statutory grant in the Alabama peace-officer immunity statute or via the common law state-agent immunity expressed in *Cranman* and its progeny.

Kelley's motion for summary judgment on Serrano's state law wrongful death claim is due to be denied.

### **Para de Medina's § 1983 Unlawful Search and Seizure Claim**

Para de Medina makes the allegation in Count VI of her complaint that Kelley violated her Fourth Amendment right to be free from unlawful search and seizure.  It is undisputed that she owned the home where Sevilla was killed, and that her home was thereafter entered without a search warrant.  In his motion for summary judgment, Kelley points out that there is no evidence to support her claim as against him as distinguished from the claim against the City.  He offers his own testimony and the testimony of other officers to show that he did not participate in the search of the premises owned by Para de Medina, who presents no evidence to the contrary.  Construing the evidence in Para de

17

Medina's favor, the court finds nothing to suggest that Kelley ever entered the home or ordered any other officer to enter it. Para de Medina has simply failed to present any evidence that Kelley is responsible for a violation of her Fourth Amendment rights. Either Para de Medina has abandoned her claim against Kelley, *see Road Sprinkler*, 10 F.3d at 1568, or has failed to meet her burden of opposing Kelley's motion, *see Brooks v. County Comm'n*, 446 F.3d 1160, 1162 (11th Cir. 2006).

Kelley's motion on this claim is due to be granted.

### **Para de Medina's Conversion Claim**

In Count VIII, Para de Medina claims that Kelley is liable to her under Alabama law for conversion, specifically for taking family photographs and other personal property from her home following Sevilla's death. In his motion for summary judgment, Kelley again points to the uncontradicted testimony that he never entered Para de Medina's home and thus could not have converted her property except under a *respondeat superior* theory, which she does not allege. There is no evidence that he ever possessed or even touched her personal property. The court can detect nothing in Para de Medina's evidence to dispute Kelley's evidence. Merely disbelieving Kelley is not enough. The undisputed facts control the disposition of Count VIII.

### **Conclusion**

Based on the foregoing, by separate order, Kelley's motion

18

for summary judgment will be granted as to Serrano's "due process" and "equal protection" claims, and as to all of Para de Medina's claims, and Kelley's motion for summary judgment will be denied as to Serrano's § 1983 excessive force claim and his state law wrongful death claim.

    DONE this 29th day of November, 2007.

                                       _____
                                       WILLIAM M. ACKER, JR.
                                       UNITED STATES DISTRICT JUDGE